**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-01349-WJM-MDB

TARA HADAM

Plaintiff,

v.

CITY OF COLORADO SPRINGS;

CHRISTOPHER PRYOR, Colorado Springs Police Officer, in his individual capacity;

DALE PETERSON, Colorado Springs Police Officer, in his individual capacity;

BLAKE EVENSON, Colorado Springs Police Officer, in his individual capacity;

JASON REESER, Colorado Springs Police Sergeant, in his individual capacity;

Defendants.

---

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

**INTRODUCTION**

1.      On June 2, 2020, Tara Hadam suffered a brutal and unconstitutional assault and an unlawful arrest at the hands of Colorado Springs Police Department ("CSPD") officers Christopher Pryor, Dale Peterson, Blake Evenson, and Jason Reeser. That evening, Ms. Hadam attended a protest in Colorado Springs organized in response to law enforcement's heinous murder of George Floyd. At the protest, Ms. Hadam peacefully demonstrated against police violence. The peaceful nature of her protest was captured on numerous videos; she was shown on the nightly news staying on the correct side of the barriers CSPD had erected with her hands held high in the air so police could see that she posed no threat.

2.      Ms. Hadam, like countless other peaceful protestors that night, gathered to protest the brutality and systemic injustices perpetrated by law enforcement officers against people of color.

3.      Despite the peaceful nature of her protest, CSPD officers subjected Ms. Hadam to the very unlawful violence that she was protesting. Video makes what happened undisputable: Ms. Hadam stood with her hands held high in the air in front of a line of CSPD officers in full riot gear and protective shields; while she stood this way, Defendant Pryor repeatedly sprayed her directly in the face with extremely painful noxious chemical sprays.



He did this to execute Defendant Reeser's order that he and his fellow officers arrest Ms. Hadam. Acting on this order, Defendants Peterson and Evenson then grabbed Ms. Hadam, swarming and bearhugging her, using further excessive force to wrongfully arrest her on false charges of resisting arrest and obstructing government operations.

4.      A jury later acquitted Ms. Hadam of these false charges.

5.      Defendants Pryor, Peterson, Evenson, and Reeser, hereinafter referred to collectively as "Defendant Officers," had no justification for this unconstitutional assault and arrest.

6.      The Defendant Officers' actions, while unconstitutional in any context, are even

more pernicious here because their excessive force and false arrest specifically targeted a peaceful demonstrator who assembled to protest unconstitutional police violence.

7.     The Defendant Officers' conduct sent a clear message: accept that police violence is an inherent part of policing in Colorado Springs or be prepared to experience that same brutality for speaking out against it. Ms. Hadam, in attending the George Floyd protest in front of the CSPD Police Operation Center spoke out against police brutality. And for speaking out against the injustice of police violence, she too became one of its many victims.

8.     The Defendant Officers caused Ms. Hadam enormous pain, forced her to defend herself from unwarranted criminal charges, discouraged her from exercising her constitutional rights, suppressed her speech, and infringed on her rights to engage in political demonstration, to be free from unreasonable seizures, and to be free from excessive use of force.

9.     Colorado Springs is liable for the Defendant Officers' unconstitutional misconduct. CSPD ordered the Defendant Officers to do what they did; ratified their conduct, thereby adopting it as the City's own; had established a pattern, practice, and custom of using excessive force and false arrests against protestors with whom the City and/or its officers disagreed; and failed to train, supervise, or discipline its officers concerning when the use of force against peaceful protestors is not reasonable, concerning respecting the free speech rights of peaceful protestors, concerning when the arrest of peaceful protestors is not reasonable, or concerning the impermissibility of making use-of-force decisions based on personal bias.

10.     In short, the Defendant Officers had the green light from Colorado Springs to unleash brutal force and unwarranted arrests on protestors demanding police reform, so they did.

## JURISDICTION & VENUE

11.     This is a civil rights action for monetary damages, declaratory relief, injunctive relief, and relief in the nature of mandamus, brought pursuant to 42 U.S.C. § 1983.

12.     This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 2201-02. Ms. Hadam seeks attorney fees and costs under 42 U.S.C. § 1988.

13.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred in the State of Colorado, and all the parties were residents of and domiciled in the State at the time of the events giving rise to this Complaint.

## PARTIES

14.     At all relevant times, Tara Hadam was a citizen and resident of Colorado.

15.     Defendant Colorado Springs is a municipality organized under the laws of the State of Colorado. Colorado Springs enforces local and state law through its law enforcement agency, CSPD. At all relevant times, Colorado Springs employed and was responsible for the supervision, discipline, and training of CSPD officers, including the Defendant Officers.

16.     At all relevant times, Defendant Christopher Pryor was a citizen and resident of Colorado acting within the scope of his official duties and under color of state law in his capacity as a CSPD police officer, a law enforcement agency of the City of Colorado Springs.

17.     At all relevant times, Defendant Dale Peterson was a citizen and resident of Colorado acting within the scope of his official duties and under color of state law in his capacity as a CSPD police officer, a law enforcement agency of the City of Colorado Springs.

18.     At all times relevant to this Complaint, Defendant Blake Evenson was a citizen and resident of Colorado acting within the scope of his official duties and under color of state law in his capacity as a CSPD police officer, a law enforcement agency of the City of Colorado Springs.

19.     At all times relevant to this Complaint, Defendant Jason Reeser was a citizen and resident of Colorado acting within the scope of his official duties and under color of state law in his capacity as a CSPD police officer, a law enforcement agency of the City of Colorado Springs.

## FACTUAL ALLEGATIONS

### Ms. Hadam Demonstrated at the Colorado Springs Anti-Police-Brutality Protests Sparked by the Killing of George Floyd

20.     On June 2, 2020, Ms. Hadam attended a protest in front of the CSPD Police Operation Center at 705 South Nevada Avenue. Ms. Hadam joined a group of protestors who gathered for planned demonstrations to protest the police killing of George Floyd.

21.     In response to the planned protest, CSPD deployed large groups of armored police officers dressed in riot gear to the protest area.

22.     CSPD officers erected barriers around the CSPD Police Operation Center to demarcate the area set out for protestors and the area occupied by police officers.

23.     CSPD officers armed themselves with crowd control weapons and long shields.

24.     CSPD officers formed a line facing the protestors.

25.     Defendant Pryor was positioned in this line.

26.     Defendant Pryor was armed with an "OC spray" canister, also known as pepper spray or bear spray, among other weapons.

27.     "OC spray" is short for "oleoresin capsicum spray." OC spray causes extreme pain and irritation to any skin it touches. It causes agonizing pain and irritation when it enters a person's eyes or is breathed in. When it enters a person's eyes, it causes temporary blindness. When it is inhaled, it causes a person to feel as if the person cannot breathe.

28.     Defendants Peterson, Evenson, and Reeser were also positioned on this line of

5

officers directly in front of the protestors, where they stood clad in riot gear.

29.     Ms. Hadam faced Defendants Pryor, Peterson, Evenson, Reeser, and other officers as she peacefully shouted demands for justice for George Floyd and other slogans that, at their core, expressed outrage with the violent state of policing in America.

30.     During the protest, Ms. Hadam stood on the correct side of the barrier erected by CSPD in the area CSPD had blocked off for protestors.

31.     Ms. Hadam never crossed the barrier demarcating the area set out for protestors.

32.     Ms. Hadam stood in a public space, often with her hands held high in the air.

33.     Ms. Hadam's body language and demeanor clearly communicated to the Defendant Officers and all others present that she was there to protest peacefully, express her grievances vocally, and protest within the parameters of lawful demonstration.

34.     Ms. Hadam never lunged at the Defendant Officers.

35.     Ms. Hadam did not brandish any weapons during the protest.

36.     Ms. Hadam stood in the designated protest area making statements against police violence, posing no threat to police or others around her.

37.     Ms. Hadam's statements did not advocate for immediate unlawful action.

**Excessive Force and Unconstitutional Arrest**

38.     The circumstances surrounding Ms. Hadam's civil rights claims were captured on a chilling video that aired on local news station, KKTV11.[1]

39.     Defendant Pryor appears on the video holding a red OC spray canister.

40.     The video shows Ms. Hadam standing several feet away from Defendant Pryor as he

---

[1] Video of the most salient portion of the encounter is available here: Defendant Pryor excessive force

begins shaking the cannister.

41.    Ms. Hadam understood Defendant Pryor's actions shaking the red OC canister as a threat. However, he did not make any verbal communication.

42.    Ms. Hadam took her mask off to demonstrate to Defendant Pryor that she was not going to defend herself against the assault Defendant Pryor was plainly preparing. She threw her paper mask and asked Defendant Pryor if he was going to spray her.

43.    Defendant Pryor answered by his actions that yes, he was going to spray Ms. Hadam. As Ms. Hadam continued to stand with her hands up in the air, Defendant Pryor, sprayed pain-inducing chemicals directly into Ms. Hadam's face, covering her with the noxious chemical solution.



44.    Ms. Hadam remained standing with her arms up before briefly trying to wipe the chemicals from her burning eyes, nose, mouth, and face, and then putting her arms back up.

45.    Once Ms. Hadam was hit in the face with these chemicals, she couldn't see. Her face was burning. She struggled to breathe. Gasping for air, she stood paralyzed, keeping her hands held high in the air to show police she was not a threat.

46.    Ms. Hadam continued holding her hands high in the air even after being sprayed in

the face.

47.     The news footage shows Ms. Hadam doing nothing but standing still, holding her hands in the air, and occasionally unsuccessfully trying to wipe the chemical spray out of her eyes.

48.     As Ms. Hadam began to gasp, Defendant Pryor pointed the pepper spray canister at her once more and sprayed her again in the face.

49.     Defendant Pryor then continued spraying the OC spray all around Ms. Hadam, recklessly unleashing three additional blasts of OC, two of which covered Ms. Hadam in more of the noxious substance.

50.     His conduct was shocking, unforgivable, and unconstitutional.

51.     Defendant Pryor did what he did as a part of arresting Ms. Hadam.

52.     Defendants Evenson and Peterson witnessed the interaction between Defendant Pryor and Ms. Hadam. They saw it unfold as the video incorporated in paragraph 38 note 1 shows.

53.     As the video makes clear, there was a significant amount of time between when Defendant Pryor began interacting with Ms. Hadam and when he sprayed her with OC spray.

54.     During this time, it was clear to Defendants Evenson and Peterson that Defendant Pryor was preparing to spray Ms. Hadam with OC spray. It was also clear to Defendants Evenson and Peterson that such an action would represent excessive force.

55.     Despite seeing that Defendant Pryor was preparing to engage in excessive force, and despite having time to intervene to prevent it, Defendants Evenson and Peterson chose not to intervene.

56.     Defendant Reeser was a Sergeant on the scene. He was in charge of determining which protestors in the immediate area where Ms. Hadam was would be arrested.

57.     Prior to Defendant Pryor spraying Ms. Hadam, Defendant Reeser decided that

CSPD officers would arrest Ms. Hadam, despite knowing she had committed no crime.

58.    In his testimony at a hearing in Ms. Hadam's criminal case, Defendant Evenson

made clear that Sergeant Reeser gave the order to arrest Ms. Hadam prior to her being sprayed.

59.    As Defendant Pryor later explained at a motions hearing, his spraying of Ms. Hadam

was part of the process of CSPD taking control of her body:

Q: So, you sprayed her because she said, "go ahead and spray me"?
A: No, I sprayed her because she was in the way and she was going to get arrested, and she needed to move.
Q: Okay. And why was she going to get arrested?
A: Because she refused to leave.

60.    Further, as Defendant Reeser explained at the same motions hearing, he made the

decision that Ms. Hadam and others close to her would be arrested well before Defendant Pryor

began spraying her:

"The decision was made that those people were going to be arrested, so initially, what our decision was – was we were going to just start going up and arresting the folks that were up front. The Defendant was one of the, sorry, is it the Defendant in this, right, okay, was one of the individuals who's up front."

61.    To complete the arrest that Defendant Pryor had begun, Defendant Reeser told

Defendants Peterson and Evenson to physically take control of Ms. Hadam.

62.    Defendants Peterson and Evenson acted on this order and charged Ms. Hadam.

63.    Ms. Hadam was still blinded by the OC spray that had been shot into her eyes.

64.    Defendants Peterson and Evenson swarmed Ms. Hadam, put her in a "bearhug,"

lifted her off the ground, and took her away.

65.    Defendants Peterson and Evenson then handcuffed Ms. Hadam and initiated

unwarranted criminal charges against her.

66.    While this was going on, another officer on scene, Officer Brockman sprayed a

round of noxious chemicals using an MK-9 Crowd Control Fogger, a weapon so powerful that it dispelled a blanket of chemical fog.[2]

67.    Officer Brockman discharged an MK-9 Crowd Control fogger feet away from where Ms. Hadam was standing. The OC spray from this completely unnecessary blast made contact with Ms. Hadam, who stood feet away from where Officer Brockman deployed it.

68.    Each of the Defendant Officers' cavalier use of force reveals an out-of-control law enforcement agency whose officers were ready and eager to indiscriminately deploy their weapons against peaceful protestors who spoke out against systemic police violence.

69.    At the time Defendant Reeser ordered Ms. Hadam's arrest and his fellow Defendants effectuated it – with Defendant Pryor spraying her with noxious chemicals and Defendants Peterson and Evenson grabbing her, bearhugging her, and forcefully arresting her – none of the Defendants possessed a warrant authorizing her arrest.

70.    Similarly, none of the Defendants had probable cause to believe that Ms. Hadam had committed any crime.

71.    Quite to the contrary, Defendants Reeser, Pryor, Peterson, and Evenson had a front-row seat to the fact that Ms. Hadam had done nothing more than speak while protesting, activity that was clearly not only legal, but constitutionally protected.

**Free Speech Retaliation**

72.    Ms. Hadam was engaged in political speech while she protested against police brutality at the June 2, 2020, George Floyd Protest.

73.    Her statements aired grievances about police violence.

---

[2] Video of this portion of the incident is available here: MK9 spray and arrest.

74.     Her participation in a political demonstration was protected free speech activity.

75.     The Defendant Officers heard the anti-police-violence slogans that Ms. Hadam chanted and yelled during the protest.

76.     In response to Ms. Hadam's exercise of her free speech rights, the Defendant Officers retaliated because they disagreed with the anti-police-violence views Ms. Hadam espoused.

77.     The Defendant Officers blasted Ms. Hadam with chemical agents that caused her pain, temporarily blinded her and prevented her from breathing, and then falsely arrested her, thereby commencing a wrongful criminal prosecution against her, all to punish Ms. Hadam for her political views and to make Ms. Hadam and others like her think twice before speaking out against police violence in the future.

78.     Defendant Pryor, the officer who initiated the excessive force against Ms. Hadam, made his motives for his actions clear when he testified at a motions hearing in the criminal case he helped unjustly initiate against Ms. Hadam.

79.     At that hearing, Defendant Pryor testified under oath that to him, the idea that the lives of Black people matter is offensive. There is no way to interpret his sworn testimony as evidencing anything other than clear, straightforward racism.

80.     Defendant Pryor testified as follows:

    Q:  So, do you think BLM is anti-cop?
    A:  I think BLM is a terrorist organization.
    Q:  Um – why do you think that?
    A:  Because they're a racist, anti-everything, anti-cop, anti-white – they're, they're no better than the KKK.

81.    BLM stands for "black lives matter."

82.    BLM is a movement that forcefully expresses what should be universally accepted as fact by anyone who is not an abject racist: that the lives of Black people matter. Reasoning from this

fact, those who participate in the movement seek to make our government's policies and actions reflect this fact.

83.     As Defendant Pryor stated in sworn testimony, to him, believing that the lives of Black people matter is equivalent to the hateful, racist, murderous ideology of the Ku Klux Klan.

84.     If one opposes making the statement that Black lives matter, it is because one believes that Black people's lives *do not* matter.

85.     By equating the belief that the lives of Black people matter with the beliefs of terrorists and the KKK, and by making clear his own belief that the lives of Black people do not matter, Defendant Pryor demonstrated that he believes in a hateful ideology that is a cancer to our country, and which has repeatedly motivated mass shootings.[3] And yet he remains employed as a police officer by Defendant Colorado Springs.

86.     Given Defendant Pryor's sworn statements expressing extreme bias against Ms. Hadam and her fellow protestors based on the content of their political message, it is apparent that the Defendant Officers' unconstitutional actions were substantially motivated as a response to Ms. Hadam exercising her free speech rights and that they intended to silence her by subjecting her to excessive force and wrongful arrest.

## Colorado Springs is liable for the Defendant Officers' unconstitutional conduct

### Ratification

87.     Ms. Hadam went to a jury trial and was acquitted of all the criminal charges the Defendant Officers sought against her.

88.     After her acquittal, Ms. Hadam made a formal complaint to CSPD concerning her

---

[3] *See, e.g.*, https://www.nytimes.com/2022/05/16/us/buffalo-shooting-replacement-theory-christchurch-el-paso.html.

wrongful arrest and the excessive force she suffered.

89.     Based on documents obtained by Ms. Hadam in response to open records requests, Ms. Hadam learned that CSPD chose not to even initiate an investigation of her complaint.

90.     According to these documents, CSPD made this decision because prior to Ms. Hadam making her complaint, CSPD had already reviewed the incident and determined that all the uses of force described herein complied with CSPD's use of force policies.

91.     According to these documents, Lieutenant Rafael Chanza was the final decisionmaker at CSPD concerning what action to take based on Ms. Hadam's complaint. CSPD delegated him the authority to act for CSPD concerning Ms. Hadam's complaint.

92.     Lt. Chanza decided on behalf of CSPD that the Defendant Officers' actions during their interactions with Ms. Hadam on June 2, 2020 complied with CSPD's policies, and that as a result CSPD would take no disciplinary action against them.

93.     According to the CSPD use of force policy in effect on June 2, 2020, CSPD officers are justified in using force to the extent that the use of force is justifiable under the test created by the Unites States Supreme Court in *Graham v. Connor* and subsequent cases from the United States Supreme Court and the Tenth Circuit. Because of this, when CSPD finds that an officer's use of force was in compliance with CSPD's policy, this is the same as CSPD finding that the use of force was constitutionally permissible under the United States and Colorado Constitutions.

94.     In this case, CSPD thus made an explicit finding that the Defendant Officers' actions described herein were constitutionally permissible.

95.     In doing so, CSPD, acting through Lt. Chanza, adopted the Defendant Officers' actions as its own, and as the actions of Defendant Colorado Springs. Because Colorado Springs explicitly ratified the unconstitutional actions of the Defendant Officers, it is liable for them.

13

**The Defendant Officers Did What Colorado Springs Ordered Them to Do**

96.     CSPD ratified the Defendant Officers' conduct because the Defendant Officers did exactly what CSPD ordered them to do.

97.     At the most basic, fundamental level, Colorado Springs is liable for the unconstitutional conduct of the Defendant Officers because when the Defendant Officers were using force against Ms. Hadam, they were carrying out orders from their superiors in CSPD to use force against the protestors.

98.     At the time of the uses of force described herein against Ms. Hadam, apart from one or two prior isolated incidents of an object being thrown, the protest had been peaceful. In the moments leading up to the use of force against Ms. Hadam, there were no such incidents. As such, at the moment CSPD ordered the Defendant Officers to use force to compel the protestors to leave, causing them to use force against Ms. Hadam, the protest was a lawful protest.

99.     Despite the fact that the protest was lawful, those in charge of CSPD's response to the protest made the illegal decision to declare the protest "unlawful" and to forcibly remove the protestors from the public space where they had been protesting – and which CSPD had previously blocked off specifically for the planned protest.

100.    CSPD ordered its officers to make illegal announcements declaring the legal protest "unlawful," so they did.

101.    CSPD then ordered its officers to use the illegal order as a basis to use force to remove any protestors who did not immediately leave the protest, so they did.

102.    The Defendant Officers received these orders from their superiors at CSPD and carried them out. As Defendant Pryor testified: "The orders were given to push the crowd back away from the barriers and the arrest teams will move forward and those people that refused to

leave or disobeyed the order, get arrested." The order Defendant Pryor referred to was the illegal one declaring the protest "unlawful" and, based on that illegal order, requiring the protestors to leave.

103.    This was CSPD's plan going into the protest. As Defendant Pryor further testified, "We discuss that prior to even going out on the street."

104.    Ms. Hadam was the protestor closest to the CSPD officers at the time the Defendant Officers received the order from their superiors to remove the protestors from the area where they were protesting. As a result, Ms. Hadam was the first protestor at this protest that CSPD officers subjected to a use of force.

105.    The Defendant Officers unconstitutional use of force predictably provoked an angry reaction from the other protestors who were present.

106.    CSPD then used this intentionally provoked angry response as claimed justification for further unconstitutional uses of force. For just one example, see the unconstitutional force that CSPD officers used against Celia Palmer and their subsequent settlement with her.[4]

**CSPD Had a Policy, Practice, and Custom Authorizing the Indiscriminate Use of Dangerous Crowd Control Weapons and Excessive Force to Silence Peaceful Protestors**

107.    None of the CSPD officers facing Ms. Hadam provided any verbal warnings to Ms. Hadam before deploying chemical agents directly into her face.

108.    Ms. Hadam, sensing that the line officers were escalating the situation when she saw Defendant Pryor begin shaking a red cannister, asked Defendant Pryor if he was going to spray her.

---

[4] https://gazette.com/news/courts/colorado-springs-to-pay-175-000-in-settlement-with-black-lives-matter-protester/article_34a37e66-845d-11ec-8bb3-07c5e75eb015.html



His response was to vindictively spray her in the face while she held her hands up in the air in a clear "don't shoot" gesture.

109.    Defendant Pryor did this because he was following CSPD's policy, practice, and established customs. CSPD had a policy, practice, and established custom of not warning protestors before deploying noxious chemicals against them.

110.    At the time of the George Floyd Protests, CSPD had a policy, practice, and established custom of targeting protestors with chemical agents even when officers faced no threat of injury from the protestor.

111.    CSPD's policy, practice, and established customs described herein were evidenced by recordings of CSPD officers at this protest. These recordings captured CSPD officers' excitement about using crowd control weapons on peaceful protestors. As one officer stated, even in the absence of any threat, "Let's just fire [the smoke grenades and tear gas], they really haven't advanced or anything yet." None of the protestors ever advanced. Still, the Defendant Officers deployed dangerous crowd control weapons on the protestors and singled Ms. Hadam out by dousing her in the face with the pain inducing chemicals again and again.

112.    They did this because CSPD's policy, practice, and custom authorized the Defendant

Officers to indiscriminately deploy dangerous crowd control weapons on peaceful protestors who posed no threat of serious bodily injury to police officers or anyone else.

113.     As further evidence of this practice, policy, and custom, CSPD officers including the Defendant officers took similar unconstitutional actions on other nights in response to the George Floyd protests.

114.     On May 30, 2020, following CSPD's practice, custom, and policy of not warning protestors before deploying noxious chemicals against them and targeting protestors with chemical agents even when officers faced no threat of injury from the protestor, CSPD officers unconstitutionally used tear gas against peaceful protestors without warning. This is reflected in police reports related to that evening.

115.     On May 31, 2020, following CSPD's practice, custom, and policy of not warning protestors before deploying noxious chemicals against them and targeting protestors with chemical agents even when officers faced no threat of injury from the protestor, CSPD officers unconstitutionally used tear gas against peaceful protestors without warning. This is reflected in police reports related to that evening.

116.     On June 1, 2020, following CSPD's practice, custom, and policy of not warning protestors before deploying noxious chemicals against them and targeting protestors with chemical agents even when officers faced no threat of injury from the protestor, CSPD officers unconstitutionally used tear gas against peaceful protestors without warning. This is reflected in police reports related to that evening.

117.     Since Ms. Hadam's experience – protesting police violence only to herself become a victim of police violence – she has been trying to make sense of what happened to her. If she were confident in the future that law enforcement would not use excessive force to punish protestors as

17

they did on June 2, 2020, she would be less fearful to exercise her right to protest and speak out against the culture of police violence that infects our state and our country. But as things stand, Defendants have effectively scared her into silence.

## Failure to Train or Supervise, or Discipline

118.   Defendant Colorado Springs had a duty to properly train, supervise, and discipline its officers with respect to protestors' right to be free from unreasonable seizures and excessive force.

119.   Defendant Colorado Springs had a duty to properly train, supervise, and discipline its officers with respect to the free speech rights of protestors engaged in political demonstration.

120.   Defendant Colorado Springs had a duty to properly train, supervise, and discipline its officers with respect to the use of chemical sprays on protestors.

121.   At the time of the events underlying this case, the George Floyd protests had been going on for over a week across the country. CSPD officers had already responded to numerous similar protests. Colorado Springs was thus aware that CSPD was having regular interactions with anti-police-violence protestors.

122.   Defendant Colorado Springs knew that its officers were generally vehemently opposed to the message of the George Floyd protestors. It knew this based on their statements to fellow officers, their statements to those in the chain of command, and their social media posts.

123.   Based in part on this knowledge, Defendant Colorado Springs further knew that, absent specific training, there was an enormous risk that CSPD officers would act on their feelings of opposition to the message of the George Floyd protestors and engage in excessive force.

124.   Defendant Colorado Springs further knew of this risk of excessive force because similar situations were playing out nightly across the country: in response to the George Floyd protests against police violence, police officers were responding with unwarranted violence.

125.     These occurrences were featured in national news, local news, and on social media in the days before the incident at issue here. Given these ubiquitous reports, it was impossible for Defendant Colorado Springs to be unaware of the force that law enforcement officers were using nightly in response to the George Floyd protests because these officers were not being specifically instructed on what they were and were not allowed to do.

126.     Despite this notice and despite its knowledge that specific training was necessary, Defendant Colorado Springs chose not to train its officers, including the Defendant Officers, concerning when it is impermissible to use force or deploy chemical agents on peaceful protestors.

127.     Defendant Colorado Springs made this choice even though it was virtually inevitable that, absent specific training, an incident such as what happened to Ms. Hadam would occur.

128.     To wit, the incident with Ms. Hadam was not a one-off occurrence. Ms. Hadam was far from the only person CSPD officers subjected to excessive force that night. Based on video recordings, it is clear that numerous people in Ms. Hadam's vicinity were subjected to the same type of excessive force (OC spray) to which Ms. Hadam was subjected.

129.     Further, Defendant Colorado Springs has already settled a separate claim of excessive force brought by Celia Palmer based on an incident that occurred at the same protest. Defendant Colorado Springs settled that case because it knew that, had it chosen to take that case to trial, its officers would have been found liable for excessive force.

130.     Despite knowing that, absent training, supervision, and discipline, its officers would engage in excessive force in response to protestors with whom they vehemently disagreed, Defendant Colorado Springs chose to abdicate all supervisory responsibility over the actions of its officers during protests. Rather than ensure its officers followed the constitution with rigorous supervision of officers at a tense protest, Colorado Springs let its officers do as they pleased to

protestors with whom they vehemently disagreed.

131.    Then, rather than discipline officers who used excessive force, CSPD instead did nothing. By doing this, CSPD made clear to its officers, including the Defendant Officers, that they would face no adverse employment actions for using unconstitutional force against protestors at the George Floyd protests.

132.    Colorado Springs did this because, as a city, Colorado Springs leadership was adverse to the George Floyd protests, adverse to Black Lives Matter, and wanted to see these protests stamped out, even by unconstitutional means.

133.    For these same reasons, Defendant Colorado Springs did not train its officers that their own political beliefs, affinity for or disagreement with a protestor's statements cannot be a factor in deciding whether to use force or how much force to use.

134.    As a result of this failure to train CSPD Officers that their political beliefs and biases may not be a basis for their decisions on how much force to use, CSPD officers only use violent force against Democratic protestors, BLM protestors, and left-leaning organizations.

135.    According to Defendant Pryor's sworn testimony at the same hearing when he equated Black Lives Matter with the KKK, CSPD officers do not use force when responding to protests by Trump supporters.

136.    According to Defendant Pryor's sworn testimony, when CSPD officers respond to Trump-supporting protests, they don't use the crowd control weapons they used on Ms. Hadam and other BLM protestors at all. As Defendant Pryor testified, for Trump supporters and MAGA protestors, as CSPD officers, "generally, we have different techniques."

137.    Colorado Springs is responsible for the inevitable result of its failures to train, supervise, and discipline.

**Ms. Hadam's Claims for Equitable Relief Are Not Moot**

138.     Since she was a high schooler, Ms. Hadam has attended political protests.

139.     In the week after Ms. Hadam was subjected to excessive force and wrongful arrest, the George Floyd protests continued in Colorado Springs.

140.     Ms. Hadam wanted to attend these protests in full and participate as she had previously but was deterred from doing so by Defendants' unconstitutional actions.

141.     Instead, Ms. Hadam only briefly attended one of the remaining George Floyd protests in Colorado Springs. She attended for only an hour and only during daylight.

142.     Ms. Hadam imposed the daytime-only restriction on her participation in the protest specifically because she was afraid that if she stayed into the night, she would once again be subjected to violations of her civil rights by Defendants.

143.     Even with this self-imposed limitation, Ms. Hadam did not feel safe at the protest and did not stay for long, leaving after an hour.

144.     Other than attending that one hour of one additional day of the George Floyd protests, Ms. Hadam has not attended another protest since the events described herein.

145.     Ms. Hadam has learned of other protests in the months since the George Floyd protests wound down. However, she has decided not to attend because she did not want to risk once again being subjected to excessive force and wrongful arrest in retaliation for speaking out.

146.     Ms. Hadam has not attended any subsequent protests in Colorado Springs because she is afraid that if she did so, she would again be subject to violations of her civil rights by Defendants and other employees of Defendant Colorado Springs. Given Defendants' actions described herein, she is not willing to take that risk.

147.     Ms. Hadam has since moved out of Colorado Springs. This move was motivated in

part by her desire to not have further interactions with the Colorado Springs Police Department and its employees, because they had violated her civil rights.

148.    Ms. Hadam has friends who still live in Colorado Springs. These friends remain involved in protests in Colorado Springs when protests occur. Ms. Hadam thus learns about scheduled protests in Colorado Springs when such events are scheduled.

149.    If Ms. Hadam could be confident that she would not be subject to unconstitutional actions by Defendants while attending a protest in Colorado Springs, she would attend. However, at present she can have no such confidence.

150.    If Ms. Hadam secured an order from the Court telling Defendants that they had violated her civil rights, barring Defendants from engaging in the kinds of abuses she has described herein, and ordering Defendant Colorado Springs to give the Defendant Officers and its other law enforcement employees remedial training to ensure they would not repeat these unconstitutional actions, she would begin attending protests in Colorado Springs again.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment
### Excessive Force
### (Against Defendants Pryor, Peterson, and Evenson)

151.    Ms. Hadam incorporates all other paragraphs as if fully set forth herein.

152.    Ms. Hadam had a protected right under the Fourth Amendment not to be subjected to excessive force by law enforcement.

153.    Defendants Pryor, Peterson, and Evenson used force on Ms. Hadam which, judged from the perspective of a reasonable officer on the scene, was unreasonable.

154.    When these Defendants used excessive force against Ms. Hadam, they violated her

constitutional rights guaranteed by the Fourth Amendment.

155.    These Defendants are also liable for their failure to intervene in the excessive force they witnessed and did nothing to stop.

156.    These Defendants' actions caused Ms. Hadam substantial harm and were a proximate cause of Ms. Hadam's damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment Violation**
**Wrongful Arrest**
**(Against Defendants Pryor, Peterson, Evenson, and Reeser)**

157.    Ms. Hadam incorporates all other paragraphs as if fully set forth herein.

158.    Ms. Hadam had a protected right the Fourth Amendment to be free from unreasonable seizures. Under this protection, the Defendant Officers were only permitted to arrest Ms. Hadam if they had a warrant for her arrest or probable cause that she had committed a crime in their presence.

159.    The Defendant Officers did not have a warrant to arrest Ms. Hadam.

160.    The Defendant Officers did not have probable cause to believe that Ms. Hadam had committed a crime.

161.    When Defendant Reeser caused Ms. Hadam's arrest and Defendants Pryor, Peterson, and Evenson arrested her, they violated her constitutional rights guaranteed by the Fourth Amendment.

162.    These actions caused Ms. Hadam substantial harm and were a proximate cause of Ms. Hadam's damages.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – First Amendment Violation**
**Retaliation for Engaging in Conduct Protected by the First Amendment**
**(Against Defendants Pryor, Peterson, Evenson, and Reeser)**

163.    Ms. Hadam incorporates all other paragraphs as if fully set forth herein.

164.    On the date of the incident, Ms. Hadam was engaged in political protest, an activity protected by the First Amendment.

165.    The Defendant Officers' actions caused Ms. Hadam to suffer an injury that would reasonably have a chilling effect on the exercise of protected free speech activity by a person of ordinary firmness.

166.    The Defendant Officers retaliated against Ms. Hadam because they disagreed with the anti-police-violence messages she communicated while protesting.

167.    The exact form of each Defendant Officer's retaliation against Ms. Hadam is detailed in this Complaint.

168.    The Defendant Officers' actions caused Ms. Hadam substantial harm and were a proximate cause of Ms. Hadam's damages.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983; Fourth Amendment; *Monell***
**(Against Defendant City of Colorado Springs)**

169.    Ms. Hadam incorporates all other paragraphs as if fully set forth herein.

170.    Colorado Springs ratified the actions of the Defendant Officers. It is therefore liable for the ratified actions.

171.    Colorado Springs ordered the Defendant Officers to carry out the actions they did against Ms. Hadam. It is therefore liable for what it ordered its officers to do.

172.    Colorado Springs established a policy, practice, and custom authorizing the

indiscriminate use of dangerous crowd control weapons and excessive force to silence peaceful protestors. It is therefore liable for what inevitably happened when its police officers followed this policy, practice, and custom.

173.    Colorado Springs failed to train, supervise, or discipline its officers concerning protestors' right to be free from unreasonable seizures and excessive force.

174.    Colorado Springs failed to train, supervise, or discipline its officers concerning the free speech rights of protestors engaged in political demonstration.

175.    Colorado Springs failed to train, supervise, or discipline its officers concerning the impermissibility of basing use-of-force decisions on whether individual officers sympathize with or disagree with protestors at a political demonstration.

176.    Colorado Springs failed to train, supervise, or discipline its officers concerning the impermissibility of using noxious chemical spray weapons on peaceful protestors.

177.    In light of the duties of police officers employed by Colorado Springs, the need for the specialized training, supervision, and discipline referenced herein was obvious. The lack of appropriate training, supervision and discipline was plainly likely to result in a violation of constitutional rights such as those described herein. As a result, Defendant Colorado Springs is liable for its failure to properly train, supervise, and discipline its officers.

178.    Colorado Springs's actions, failures to act, and choices detailed herein caused Ms. Hadam substantial harm and were a proximate cause of Ms. Hadam's damages.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process Violation**
**Excessive Force**
**(Against Defendants Pryor, Peterson, and Evenson)**

179.     Ms. Hadam incorporates all other paragraphs as if fully set forth herein.

180.     On the date of the incident, Ms. Hadam was engaged in political protest, an activity protected by the First Amendment.

181.     Defendant Pryor vehemently disagreed with the statements Ms. Hadam was making.

182.     Because Defendant Pryor did not like what Ms. Hadam was saying, he chose to inflict extreme pain on her in with repeated blasts of OC spray, which were completely unwarranted.

183.     Defendant Pryor's use of force against Ms. Hadam was inspired by malice and was a manifestation of his excessive zeal to use force against protestors with whom he disagreed. Stated more colloquially, Defendant Pryor hated the Black Lives Matter protestors he was encountering on June 2, 2020 and was eager to use force against them. He sprayed Ms. Hadam with OC spray because he wanted to inflict pain on BLM protestors.

184.     Defendant Pryor's conduct was outrageous and conscience shocking. His actions caused Ms. Hadam extreme pain and were entirely unjustified.

185.     Defendants Peterson and Everson are liable for their failure to intervene and prevent Defendant Pryor's unconstitutional actions.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Hadam respectfully requests this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law and equity, including, but not limited to:

a)   Issuing a judgment declaring that the acts of Defendants described herein violated the

U.S. Constitution and Colorado Constitution;

b) Issuing an injunction ordering Defendant Colorado Springs and its agents to cease engaging in the unlawful acts described herein;

c) Awarding compensatory damages to Ms. Hadam, according to proof at trial, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

d) Awarding costs of suit and attorneys' fees;

e) Awarding pre-judgment and post-judgment interest at the highest possible rate; and

f) Providing such other and further relief as the Court may deem just, proper, and appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: August 30, 2022

*/s Adam Frank*
Adam Frank
Cameron Bedard
Frank Law Office LLC
1133 N Pennsylvania St.
Denver, CO 80203
Phone: (303) 800-8222
Fax: (303) 800-9122
adam@franklawoffice.com
cameron@franklawoffice.com
*Attorneys for Ms. Hadam*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and thereby served the foregoing on:

Gordon L. Vaughan
gvaughan@vaughandemuro.com

Brian Stewart
Brian.Stewart@coloradosprings.gov

*s/ Adam Frank*
Frank Law Office LLC